IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION



**FILED**

MAY 2 0 2020

Clerk, U.S. District Court
District Of Montana
Missoula

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>WANDA JOYCE MURRAY and RONALD E. MOON, Individually and as Trustee(s) of the Moon Family Trust,<br><br>        Defendants. | CV 19–23–M–DLC<br><br><br>ORDER |
| WANDA JOYCE MURRAY and RONALD E. MOON,<br><br>        Counterclaim Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>        Counterclaim-defendant. | |

The United States moves for summary judgment on the counterclaims filed by Defendants and Counterclaim Plaintiffs Ronald E. Moon ("Moon") and the Moon Family Trust, through its trustee Wanda Joyce Murray ("Murray"). (Docs. 49; 51.) Murray filed a response brief, contending that the motion seeking to dismiss her counterclaims should be denied based on the United States' failure to

comply with the Court's Local Rules. (Doc. 59.) Moon, too, filed an "Objection to Plaintiff's Motion for Summary Judgment and [a] Motion for Summary Judgment Upon Each of Moon's Counter-Claims." (Doc. 58.) However, Moon advances no legal theory as to why he is entitled to summary judgment. Instead, he simply alleges deficiencies in the Administrative File (Doc. 54-1) and urges the Court to deny the United States' motion against his counterclaims. Therefore, the Court construes Moon's filing (Doc. 58) as a response to the United States' motion, rather than a cross-motion for summary judgment.[1]

For the following reasons, the Court will grant the United States' motions for summary judgment and dismiss Moon and Murray's counterclaims. And, because the United States' claims have been rendered moot, the Court dismisses this entire case with prejudice.

## BACKGROUND

In 2006, as a trustee for the Moon Family Trust, Moon purchased 70.25 acres of land in Sanders County, Montana. (Docs. 1 at 3; 1-1; 1-2.) Apart from a three-acre "set-aside," a Wetland Reserve Program easement ("the Easement") held by the United States encumbered the property. (*Id.*) The Easement endeavored to conserve wetlands through cooperation between the owners of

---

[1] The Court has previously advised Moon that it will not supply potential legal arguments to support his bald recitations of fact (Doc. 16), and declines to do so at this time.

dominant and servient tenements—respectively, here, the United States and the Moon Family Trust. (Doc. 1-1.)   To that end, the Easement restricted the servient landowner from engaging in various activities, including logging and building, and allowed the United States "a right to enter unto the [E]asement area to undertake . . . any activities to restore, protect, manage, maintain, enhance, and monitor the wetland and other natural values of the easement area." (*Id.*)

In 2011, a slow-burning dispute ignited between Moon and the United States when Moon indicated to the United States that any effort to enter onto the Easement would be met with his resistance. (Doc. 1 at 5.)  Over course of the next seven years, Moon—eventually joined by Murray[2]—warned the United States to stay off the property and repeatedly expressed his interest to terminate the Easement. (*See, e.g.,* Doc. 1-4.)  Finally, in June 2018, Murray sent a notarized letter to the United States, reflecting her belief that the United States had "fail[ed] to act to protect, preserve and defend [her] Conservation Property" by the Easement terms. (Doc. 1-10.)  Therefore, Murray insisted that the Easement was "indefinitely suspended and of no effect[.]" (*Id.*)

The United States, understanding Moon and Murray's conduct to effectively hamstring its ability to carry out various responsibilities under the Easement terms

---

[2] In an attachment to his Motion to Dismiss the Complaint, Moon attests that he executed an assignment in favor of Murray to become the trustee for the Moon Family Trust. (Docs. 4-1; 4-2.)

and concerned that Moon and Murray were causing property damage, filed the instant action in January 2019. (Doc. 1.) Alleging trespass and violation of the Easement terms, the United States sought injunctive, declaratory, and monetary relief to the extent any restoration or rehabilitation activities were required. (*Id.* at 11–13.) Moon answered and moved to dismiss the complaint (Docs. 3; 4); Murray failed to answer and instead filed ten counterclaims (Doc. 7). Before the Court ruled on the motion to dismiss, the United States moved for mediation based on proceedings in a parallel action in state court. (Docs. 14; 15.) For reasons independent from the United States' request for mediation, the Court denied the motion to dismiss. (Doc. 16.) Then, notwithstanding Moon's insistence that a settlement conference would be futile (Docs. 17; 19), the Court granted the United States' motion for court-assisted mediation and referred the matter to Magistrate Judge Kathleen L. DeSoto (Doc. 20).

As Moon predicted, the mediation was unsuccessful, and on January 24, 2020, the Court held a scheduling conference. (*See* Doc. 41.) There, the Court expressed its concern to Murray that, because she never answered the Complaint, she was in jeopardy of default. Moon and Murray confirmed that the Moon Family Trust no longer owned the property and that the case in state court had been dismissed. Consequently, the United States explained that its two claims—trespass and violation of easement terms—were rendered moot, as its access to the

-4-

Easement was no longer restricted.  (Doc. 37 at 11–12.)  Accordingly, only Murray's counterclaims remained live.

Following the hearing, and pursuant to this Court's order (Doc. 41), Murray filed an answer (Doc. 42) along with amended counterclaims (Doc. 44).  Moon also filed counterclaims.  (Doc. 43.)  The United States moved for summary judgment on both sets of counterclaims, arguing that the court lacked subject matter jurisdiction, or in the alternative, that it was entitled to judgment as a matter of law on the merits.  (Docs. 49; 50; 51; 52.)  Moon then filed a document the Court characterizes as a response brief, contending that various documents were absent from the Administrative File, and concluding that the United States' motion for summary judgment should be denied based on its failure to comply with the Court's local rules.  (Doc. 58.)  Moon did not dispute the United States' position on the merits, however.  Likewise, Murray responded to the United States' motion for summary judgment on her counterclaims by pointing to its failure to contact her prior to filing and urging the Court to lift discovery so that she could develop more facts.  (Doc. 59.)  She, too, raised no disputes—factual or legal—as to whether this Court enjoys subject matter jurisdiction or whether her counterclaims state viable causes of action.

## LEGAL STANDARD

Summary judgment is proper if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing a "properly supported motion for summary judgment may not rest upon the mere allegations or denials of his [or her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* (citation and quotation marks omitted).

## DISCUSSION

As a preliminary matter, the Court rejects Moon and Murray's arguments that it should deny summary judgment on a procedural basis for the United States' failure to contact them prior to filing. The United States acknowledges that it did not strictly adhere to the District of Montana's Local Rule 7.1(c). (Docs. 60 at 5; 61 at 4.) However weak the Court may find the Government's excuse, though, it is unconvinced that denial on this basis is warranted. The Rule's purpose had previously been served, and the United States' shortcoming did not prejudice

-6-

Moon and Murray.  Furthermore, a dispositive ruling on this technical issue would only result in a meaningless delay.[3]

The Court turns, then, to the merits of the United States' motions for summary judgment.  Moon and Murray's counterclaims are not a model of clarity. However, because they are proceeding *pro se*, the Court construes their pleadings liberally, holding them to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (internal quotation marks and citation omitted).  Reviewing Moon and Murray's counterclaims collectively, the Court organizes them into three categories: (1) allegations sounding in the torts of malicious prosecution, libel, slander, and misrepresentation; (2) claims that the United States acted tortiously throughout the

---

[3] The January 24, 2020 hearing satisfied the purpose of the contact rule by notifying Moon and Murray of the United States' intent to move for summary judgment and ascertaining whether they would object.  At that time, the Court explicitly explained to Moon and Murray—on the record—the basis for the United States' forthcoming motions for summary judgment: "the government is contending that as a matter of law, I don't have any jurisdiction over your claims." Moon responded, "I understand that . . . . I understand what they're going for."  More importantly, while the Rule permits the Court to deny motions on under Rule 7.1(b)(4), "denial must be *without prejudice* on the first occasion and the filer must be given an opportunity to refile the motion."  D. Mont. L.R. 7.1(b)(4) (emphasis added).  Therefore, were the Court to deny the United States' motions under this Rule, the United States would simply refile, leaving the parties and the Court in the exact same positions where they now sit.  Under these circumstances, where Moon and Murray were effectively notified of the United States' impending motions, the Court declines to facilitate the substantively empty and time-consuming exercise of denying the motions on this basis.

course of its management activities on the Easement;[4] and (3) a charge that the United States authorized a wedding party to trespass on the property.

By and large, this categorization tracks with the United States' characterization of the counterclaims, to which neither Moon nor Murray objects. The United States argues that sovereign immunity bars the Court's jurisdiction over the counterclaims falling into the first and second categories, and that no genuine factual disputes exist to preclude judgment as a matter of law on the third allegation. Again, Moon and Murry provide the Court with no responsive legal arguments on these issues and raise no dispute on material facts, despite a full opportunity to do so.

The Court will first consider the United States' argument as it relates to federal subject matter jurisdiction over the counterclaims falling into the first two categories. Second, it will determine whether a factual dispute precludes summary judgment on Murray's trespass allegation.

---

[4] The United States offers alternative bars to jurisdiction if the Court construes this category of claims as allegations of breach of contract or quasi-contract.  (Docs. 50 at 24; 52 at 27.) However, Moon and Murray's allegations that the United States failed to exercise "due care" throughout their respective counterclaims, along with their explicit references to the United States' allegedly negligent and intentional acts, convince the Court that they properly sound in tort.  *See Skokomish Indian Tribe v. United States*, 410 F.3d 506, 510 (9th Cir. 2005) (en banc) (comparing claims that the United States behaved tortiously by failing to exercise due care against claims that the United States failed to abide by its contractual obligations).

## I.    Jurisdiction

"It is well settled, of course, that the Government is ordinarily immune from suit[.]" *Honda v. Clark*, 386 U.S. 484, 501 (1967).  When Congress waives sovereign immunity, it specifies the terms and conditions under which it consents to suit.  *Id.*  Whatever Congress' terms and conditions may be, "[its] waiver of the Federal government's sovereign immunity must be unequivocally expressed in the statutory text . . . [and] will be strictly construed, in terms of scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996).  Moreover, "the existence of [Congress'] consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  Accordingly, "[w]here a suit has not been consented to by the United States, dismissal of the action is required." *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985).

Relevant to Murray and Moon's counterclaims, courts have firmly rejected the theory of implied waiver.  6 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1426 (3d ed. 2010).  That the United States commences a suit "does not amount to a waiver of sovereign immunity subjecting [it] to an *affirmative* adverse judgment on a counterclaim filed by [a] defendant." *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir. 1970) (per curiam) (emphasis added).  Indeed, consent to counterclaims seeking recoupment or offset—claims that "reduce or eliminate the amount of money that would

otherwise be awarded to the plaintiff" if successful—may be inferred. *United States v. Washington*, 853 F.3d 946, 968 (9th Cir. 2017). Still, absent sovereign consent, a counterclaim "cannot result in an affirmative monetary judgment in favor of the party asserting the claim." *Id.* (citation omitted).

In sum, then, claimants seeking affirmative monetary relief from the United States "must demonstrate that the government has waived its immunity to the type of claim it asserts." *United States v. Lockheed L-188 Aircraft*, 656 F.2d 390, 393 (9th Cir. 1979). Apart from the narrow circumstances of recoupment or offset, this threshold jurisdictional requirement "is true of a counterclaim as well as of an original suit." *Id.* (citing *United States v. Finn*, 239 F.2d 679, 682 (9th Cir. 1956)).

Here, Murray and Moon point to three general statutes to establish the Court's jurisdiction over their counterclaims: 28 U.S.C. §§ 1345, 2201, and 1331. (Docs. 43 at 4; 44 at 6.) However, a waiver by Congress of the federal government's immunity is not found in any of these three statutes. *See United States v. Park Place Assocs., Ltd*, 563 F.3d 907, 933 (9th Cir. 2009) (stating that § 1345 "plainly does not constitute a waiver of sovereign immunity"); *Gilbert*, 756 F.2d at 1558 (confirming that § 1331 merely provides original jurisdiction in civil actions arising under federal law, and "cannot by itself be construed as constituting a waiver" of immunity); *Cal. Shock Trauma Air Rescue v. State Compensation Ins. Fund*, 636 F.3d 538, 543 (9th Cir. 2011) (rejecting the argument that § 2201 is

anything but "procedural only"). Thus, without any waiver of sovereign immunity, Moon and Murray's proffered trinity of statutes fail to provide a jurisdictional toehold for their counterclaims.

Moon and Murray's formal jurisdictional statements notwithstanding, though, the Court bears "an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). In an effort to properly characterize the claims for relief presented, the Court notes that Murray[5] asserts—outside her formal jurisdictional statement—that her counterclaims "fall within the Federal Torte (sic) Claims Act, etc." and goes on to assert that "[t]he Court of Federal Claims is not a proper [v]enue for the [h]earing of these [m]atters." (Doc. 44 at 7.) Accordingly, and because the Court agrees that the counterclaims sound in tort and affords liberal construction to Murray and Moon's respective counterclaims, it looks to the Federal Tort Claims Act ("FTCA") to determine whether an immunity waiver exists therein that would confer jurisdiction.

The FTCA waives sovereign immunity for private tort actions against the United States "under circumstances where the United States, if a private person,

---

[5] While the Court fails to find a similar informal jurisdictional statement in Moon's counterclaims (Doc. 43), Murray notified the Court at the January 24, 2020 hearing that she drafts the pleadings for herself, as the Moon Family Trust trustee, and for Moon. Therefore, the Court assumes a similar intent as it relates to the nature of Moon's counterclaims.

would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).  So, in this case, "[t]o recover under the FTCA, [Moon and Murray] must show the government's actions, if committed by a private party, would constitute a tort in Montana." *Love v. United States*, 60 F.3d 642, 644 (9th Cir. 1995).  The FTCA's waiver aside, though, certain categories of claims are exempt from the FTCA's waiver of sovereign immunity.  *See generally* 28 U.S.C. § 2680.  When a claim falls within an exception to the FTCA's sovereign immunity waiver, a federal court is without subject matter jurisdiction to hear the case.  *Mundy v. United States*, 983 F.2d 950, 952 (9th Cir. 1993).

Here, the Government contends that the waiver exceptions set out in 28 U.S.C. § 2680(h) and the so-called "discretionary function" exception under 28 U.S.C. § 2680(a) apply to prohibit most of Moon and Murray's counterclaims. The Court agrees and will address each section in turn.

### A.    Counterclaims Excepted from FTCA Immunity Waiver under 28 U.S.C. § 2680(h)

Congress provided an express exception to the FTCA's immunity waiver for "[a]ny claim arising out of . . . malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]" 28 U.S.C. § 2680(h).  While claims arising out of malicious prosecution, abuse of

-12-

process, libel, and slander are more readily identifiable, the Ninth Circuit appreciates that determining whether a claim is one for misrepresentation is difficult, and indeed, "slippery." *United States v. Fowler*, 913 F.3d 1382, 1387 (9th Cir. 1990). That is, "any misrepresentation involves some underlying negligence and any negligence can be characterized as one for misrepresentation because any time a person does something he explicitly or implicitly represents that he will do the thing non-negligently." *Id.* (quoting *Guild v. United States*, 685 F.2d 324, 325 (9th Cir. 1982) (internal quotation marks omitted).

Slipperiness aside, the Court is not without guideposts. "The Government is liable for injuries resulting from negligence in performance of operational tasks even though misrepresentations are collaterally involved. It is not liable, however, for injuries resulting from commercial decisions made in reliance on government misrepresentations." *Guild*, 685 F.2d at 325. Specifically, the misrepresentation exception applies to "claims for damages resulting from commercial decisions based upon false or inadequate information provided by the government." *Id.* Therefore, to fall into the misrepresentation exception, the "essential factor" of the action must be "the [claimant's] reliance upon misinformation communicated to him [or her] by the [g]overnment." *Id.*

Here, the Court agrees with the United States' assessment that the § 2680(h) exception to the FTCA's waiver of sovereign immunity serves to bar several

counterclaims Moon and Murray advance.  First, both Moon and Murray allege that the United States filed suit against them in an underhanded effort to change the property's ownership.  (Docs. 43 at 7 (Moon Counterclaim II); 44 at 11 (Murray Counterclaim III).)  Congress explicitly denied its consent to liability for malicious prosecution, 28 U.S.C. § 2680(h), which the Court deems a fair characterization of Moon and Murray's respective allegations on this issue.  Likewise, § 2680(h)'s libel and slander prohibition applies to bar Moon's assertion that the United States inflicted a dignitary injury when it "defamed [his] [c]haracter" by communicating information about him to neighbors and characterizing him as a "Government Hater."  (Doc. 43 at 10 (Moon Counterclaim VI).)

Second, the misrepresentation exception applies to block the Court's jurisdiction over another swath of Moon and Murray's claims.  Murray alleges that the United States falsely represented that it would survey the Easement to identify an access to the three-acre, Easement-locked, set-aside.  (Doc. 44 at 11 (Murray Counterclaim IV).)  Similarly, she claims that the Government misrepresented the future accessibility of the set-aside when it had no intent to grant such access, for utilities or otherwise.  (*Id.* at 12 (Murray Counterclaims VI, VII).)  For his part, Moon alleges, too, that prior to his purchasing the property on behalf of the Moon Family Trust, the United States misrepresented the future accessibility of the set-aside.  (Doc. 43 at 8–9 (Moon Counterclaims IV, V).)

-14-

In these claims, the "essential factor" is Moon and Murray's purported reliance upon misinformation communicated to them by the Government. However, under § 2680(h), the United States is not liable for the commercial decisions Moon and Murray made on behalf of the Moon Family Trust, even if those decisions were made in reliance on Government misrepresentations. Accordingly, sovereign immunity bars the Court's jurisdiction over the above-summarized counterclaims.

In sum, the Court finds that § 2680(h) takes the following counterclaims outside the reach of its jurisdiction: Moon's Counterclaims II, IV, V, and VI; and Murray's Counterclaims III, IV, VI, VII. Therefore, the United States motions for summary judgment on these claims are granted. The Court turns, then, to consider whether the discretionary function exception similarly applies to bar other counterclaims as the Government contends.

### B.   Counterclaims Excepted from FTCA Immunity Waiver under 28 U.S.C. § 2680(a)

Like § 2680(h), the discretionary function exception restores the sovereign immunity the FTCA broadly waives, *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014), and "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by individuals," *United States v. Varig Airlines*,

467 U.S. 797, 808 (1984).  The exception excludes from the FTCA's waiver of immunity "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).

Whether the discretionary function exception applies turns on the "nature of the [challenged] conduct, rather than the status of the actor," and requires a court to conduct a two-step inquiry.  *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (citation omitted).  As the language of the exception demands, "a court must first consider whether the action is a matter of choice for the acting employee."  *Id.* Therefore, the exception is inapplicable "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  *Id.*

If the conduct indeed involves an element of choice, then "a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield."  *Id.*  Congress intended the discretionary function exception to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *Varig Airlines*, 467 U.S. at 814.  Therefore, the exception insulates the government from liability for "actions and decisions based on considerations of public policy."  *Berkovitz*, 486 U.S. at 537.

-16-

As an initial matter, "determining the precise action the government took or failed to take . . . is a necessary predicate to determining whether the government had discretion to take that action." *Young*, 769 F.3d at 1054. Therefore, before conducting the two-step *Berkovitz* inquiry, the Court must first analyze with particularity the specific agency actions challenged. *Id.* at 1053. That is, the Court must first identify Moon and Murray's "specific allegations of agency wrongdoing" by looking to the charges in their respective counterclaims. *See id.*

Here, the United States contends that Moon's Counterclaims I and III and Murray's Counterclaims I, V, VIII, IX, and X fall within the discretionary function exception. (Docs. 50 at 23; 52 at 24.) In Counterclaim I, Moon alleges that the United States wrongfully failed to meet his reasonable expectation that he would be compensated for fourteen years of "conservation work" on the Easement. (Doc. 43 at 6.) Moon asserts in Counterclaim III that the United States breached a duty of care when it denied his cost-share proposals. (*Id.* at 7.) At base, then, the government action Moon challenges is the United States' denial of his cost-share proposals for activities on the Easement—either in the form of explicit denials before the proposed activity would occur or implicit denials after Moon had already engaged in conservation work on the Easement.

For her part, Murray asserts in her Counterclaim I that the United States wrongfully permitted a neighboring landowner to build a fire-line on the Easement.

(Doc. 44 at 10.)  And, like Moon, Murray alleges in Counterclaim V that the United States unlawfully denied her cost-share proposal for her conservation work on the Easement.  (*Id.* at 12.)  In Murray's Counterclaim VIII, she claims that the United States' activities—or lack thereof—on the Easement interfered with her quiet enjoyment.  (*Id.* at 13.)  Finally, in Counterclaims IX and X, Murray alleges that, due to the United States' fire management failures, she suffered economic and personal injuries.  (*Id.* at 13–14.)  In other words, Murray challenges the following government actions: (1) the United States' denial of her proposals to share costs for her conservation work on the Easement; and (2) the United States' improper management of the Easement.

So, then, "the specific allegation[s] of agency wrongdoing" that the Court must use in determining whether the discretionary function applies to these counterclaims are: (1) Moon and Murray's allegations that the United States failed to approve their cost-share proposals; and (2) Murray's allegations that the United States failed to properly manage the Easement.  In the Court's view, these two allegations are more properly stated as one—that the United States mismanaged the Easement by either failing to do conservation work at its own cost or on a cost-share basis with Moon and Murray.  With this allegation in mind, the Court turns to the two-step *Berkovitz* inquiry.

The analysis at *Berkovitz*'s first step—"whether the decision at issue involve[d] an element of judgment or choice"—is relatively straightforward. Neither party disputes that the United States' management direction on the Easement was discretionary.  That is, neither the United States nor Moon and Murray identifies any statute, regulation, or policy prescribing any specific course of conduct.  Instead, Moon and Murray point to their "reasonable expectations" as the servient landowners and allege that the United States breached duties of care when it failed to meet those expectations.  The challenged conduct was a matter of choice for the United States staff and was discretionary under the first *Berkovitz* step.

The dispositive question, then, is whether the United States' management choices related to cost-share proposals and fire management activities on the Easement were "grounded in social, economic, and political policy" considerations. *See Varig Airlines*, 467 U.S. at 814.  The Ninth Circuit has noted that "[g]overnment actions can be classified along a spectrum, ranging from those totally divorced from the sphere of policy analysis, such as driving a car, to those fully grounded in regulatory policy, such as the regulation and oversight of a bank." *Young*, 769 F.3d at 1055 (citation and internal quotation marks omitted). The Court begins by reviewing the specific policy that the United States contends formed the basis of the decisions at issue here.

-19-

The Government points to the Wetland Reserve Program ("the Program"),

the statute that authorized the United States to purchase and manage the Easement.

*See* 16 U.S.C. § 3837 *et seq.*[6]   The Program provides that,

> [i]n return for granting of an easement by an owner . . . the Secretary
> [of Agriculture] *shall share the cost* of carrying out the establishment
> of conservation measures and practices, and the protection of the
> wetland functions and values, including necessary maintenance
> activities, as set forth in the plan *to the extent that the Secretary
> determines that cost sharing is appropriate and in the public interest.*

16 U.S.C. § 3837c(a)(1) (emphasis added).   The plain language of the statute

anticipates that the Government will balance the cost of carrying out conservation

measures on a Program easement against broader public interests.   Additionally,

the Program "reserves no role for the landowner in developing a conservation

plan" and "vests in the Secretary [of Agriculture] discretion to include any

desirable provisions in the conservation plan." *Big Meadows Grazing Ass'n v.*

*United States*, 344 F.3d 940, 943 (9th Cir. 2003) (citing 16 U.S.C. § 3837a(c),

(b)(4)).   Furthermore, the Program's implementing regulations iterate that the

purpose of the Program is to "promote the restoration, protection, enhancement,

maintenance and management of wetland functions and values."   7 C.F.R.

§ 1467.4(a)(2) (2003).   To that end, when evaluating restoration cost-share

---

[6] As the United States explains, this statute was repealed in 2014.  Pub. L. 113-79, Title II,
§ 2703(a), Feb. 7, 2014, 128 Stat. 767.  However, the repeal does not affect the validity of
easements entered into pursuant to the Program prior to February 7, 2014.

agreement offers from landowners, the government may consider, *inter alia*, "[t]he extent to which the purposes of the easement program would be achieved on the land" and "[t]he cost effectiveness of *each* easement or other interest in [Program-] eligible land, so as to maximize the environmental benefits per dollar expended[.]" *Id.* at § 1467.6(a) (emphasis added).

The United States also offers the declaration of the Natural Resources Conservation Service ("NRCS") Assistant State Conservationist for Management and Strategy, Kristine Berg, to support its position that easement management under the Program and cost-share decisions are fully grounded in regulatory policy. (Doc. 54.) Berg explains that "[d]etermining how, when[,] or if habitat modifications will occur on any particular Wetland Reserve Program Easement involves weighing[.]" (*Id.* at 5.) Among the factors weighed, Berg identifies:

> [t]he competing needs of other Wetland Reserve Program easements in the state; the many other program needs . . . administered by NCRS; different wildlife and wetland habitat needs on any particular easement location; limited funding and employee time available to implement, manage, or monitor such easements, and a variety of relationships with state and local partners and even neighboring landowners.

(*Id.*) In other words, not unto this world alone was the Easement here procured and managed. The Government surveys and weighs a field of competing macro-interests—federal, state, local—to reach management determinations on the individual easement level.

The express language of the operative warranty deed here, too, buttresses the United States' argument that decisions are policy-driven as it relates to the Program-authorized Easement.  (*See* Doc. 1-1.)  There, the prefatory language explains that the purpose of the Easement "is to restore, protect, manage, maintain, and enhance the functional value of wetlands and other lands," with the intent that the servient landowner is provided only "the *opportunity* to participate in the restoration and management activities on the [E]asment area."  (*Id.* at 1 (emphasis added).)  However, nothing in the warranty deed conveys any right to the servient landowner to determine management direction.  Instead, the United States reserves the unilateral right to "undertake, at its own expense or on a cost share basis with the [l]andowner or other entity, any activities to restore, protect, manage, maintain, enhance, and monitor the wetland and other natural values of the easement area."  (*Id.* at 3.)  For its part, the servient landowner reserves only the rights of title, quiet enjoyment, control of public access, recreational uses, and subsurface resources.  (*Id.* at 1–2.)

Against this backdrop, the Court finds that the management decisions that Moon and Murray challenge are clearly linked to social and political policies relating to financial and environmental resource management.  The allegation here—that the United States mismanaged the Easement by either failing to do conservation work at its own cost or on a cost-share basis with Moon and

Murray—attacks government action "fully grounded in regulatory policy, [like] the regulation and oversight of a bank." *See Young*, 769 F.3d at 1055 (citation and internal quotation marks omitted).  Easement management decisions implicate a choice between competing policy considerations of maximizing the stretch of limited funding and resources and prioritizing Program easements based on environmental need.  (*See* Doc. 54 at 5.)  And, rather than "wav[ing] the flag of policy as a cover for anything and everything it does that is discretionary," the United States demonstrates that the challenged management decisions here were actually susceptible to analysis under the policies it identified.  *See Young*, 769 F.3d at 1057.

Therefore, with no factual or legal dispute raised by Moon or Murray, the Court finds that the United States management decisions as it relates to the Easement satisfy *Berkovitz*'s second analytical step.  That is, the discretionary function exception applies to prevent the Court's second-guessing the Government's policy-driven decisions.  Accordingly, the United States is entitled to judgment as a matter of law on Moon's Counterclaims I and III and Murray's Counterclaims I, V, VIII, IX, and X, and they are dismissed with prejudice.

## II.   Murray's Trespass Counterclaim

In Counterclaim II, Murray asserts that the United States "knowingly interfere[d] with [her] 'Right to Control' access to her Property by authorizing the

use of [her] Property for 'vehicle parking,'" and seeks at least $35,000 in damages. (Doc. 44 at 10.)  The Court construes this counterclaim as a common law trespass allegation, a construction derived by looking to the gravamen of the assertion: the United States intentionally caused a third person or people to enter onto Murray's property without her permission.  *See* Restatement (Second) of Torts § 158.  This construction is further buttressed by Murray's insistence that her counterclaims sound in tort ("Murray's Counter-Claims fall within the Federal Torte (sic) Claims Act, etc.").  Notably, while FTCA § 2680(h), discussed *supra*, has been described colloquially as the "intentional tort exception," it "does not remove from the FTCA's waiver all intentional torts, *e.g.*, conversion and trespass." *Levin v. United States*, 568 U.S. 503, 507 n.1 (2013).

Here, Murray can recover under the FTCA if she shows that the government's actions, "if committed by a private party, would constitute a [trespass] in Montana." *See Love*, 60 F.3d at 644.  On summary judgment, the United States argues that no genuine factual dispute exists as it relates to the requisite intent element of trespass to land.  (Doc. 52 at 31–32.)  "[I]ntentional trespass does not require proof of specific intent, i.e., that the tortfeasor intended to enter or remain on property owned or controlled by another." *Davis v. Westphal*, 405 P.3d 73, 82 (Mont. 2017).  Instead, the intent element of trespass in Montana "only requires proof that the tortfeasor intentionally entered or remained, *or caused*

-24-

*a third party or thing to enter* or remain, upon the property of another regardless of the tortfeasor's knowledge, lack of knowledge, or good faith mistake as to actual property ownership or right." *Id.* (emphasis added).

Notwithstanding the sweeping protection trespass generally provides landowners, the United States argues that it never authorized, or "caused," a third party to park on the Easement, as Murray contends. In support, it proffers the declaration of Ben Montgomery, the Supervising District Conservationist for the NRCS, who states that, to his knowledge, no such authorization was given, nor is any such authorization reflected in the Administrative File. (Docs. 56 at 5; 54-1.) Montgomery goes on to explain that parking vehicles on Program easements "is not typically something NRCS field office employees would approve, especially without any documentation in our agency files." (Doc. 56 at 5.)

In response, Murray raises no legal or factual dispute with the United States' position on this issue. Indeed, she fails to respond to this argument at all, despite the full opportunity to do so.[7] The bare factual allegations in her pleading are insufficient to generate a genuine dispute, and the Court will not create one for her.

---

[7] Murray protests that she has been unable to develop facts. (Doc. 59.) However, and on this counterclaim in particular, a declaration from Murray herself and/or from Moon may have been enough to generate a factual dispute to preclude summary judgment. Alternatively, as the Government points out, Rule 56(d) requires the nonmovant to "show[] *by affidavit or declaration* that, for specified reasons, it cannot present facts essential to justify its position." Fed. R. Civ. P. 56(d) (emphasis added). Murray's *pro se* status notwithstanding, she adeptly navigates the legal system and clearly understands the purpose and function of affidavits and declarations at the

Accordingly, the Court agrees with the United States that no genuine factual dispute exists for trial as to whether it authorized a third party to park on the Easement. Trespass requires the participation of the purported tortfeasor, and the record here is devoid of any evidence that the United States was involved in the third party's alleged entry onto the Easement. Therefore, the United States is entitled to judgement as a matter of law, and the Court grants its motion for summary judgment. Murray's Counterclaim II is dismissed with prejudice.

### ORDER

For the foregoing reasons and pursuant to Federal Rule of Civil Procedure 56, IT IS ORDERED that the United States' motions (Docs. 49; 51) are GRANTED. IT IS FURTHER ORDERED that Moon's motion for summary judgment (Doc. 58) and the United States' complaint (Doc. 1) are respectively DENIED and DISMISSED AS MOOT. Finally, IT IS ORDERED that this entire case is DISMISSED WITH PREJUDICE.

The Clerk shall enter judgment in favor of Plaintiff and Counterclaim Defendant United States and against Defendants and Counterclaim Plaintiffs Moon and Murray, individually and as trustees of the Moon Family Trust.

---

summary judgment phase. (*See* Doc. 59-1.) Furthermore, the Court's discovery stay aside, Murray simply failed to respond to the Government's argument on this issue in her brief.

DATED this __20th__ day of May, 2020.

Dana L. Christensen, District Judge
United States District Court